Good morning, Your Honors. My name is Barrett Beasley from Salim Beasley. I'm here on behalf of Gail Holmes, the appellant. The most alarming ruling to come out of the district court in this case was that Mrs. Holmes' product liability claim was time-barred because it started to accrue on the day of the incident. The first point I'd like to make is that Gail Holmes' medical condition was such that she was not aware of anything. Was this during the period of time where she was described as being in a coma? Yes, sir. She was actually in the hospital for almost three months and she was put into the ICU within three days of being discharged. She was heavily sedated because of the pain from her burn injuries. She went into septic shock. She had eight operations. She had eight surgeries. So during this course of time, she really wasn't aware of anything but that she might not make it. And when did she come out of that coma? Well, she came out of the coma on October 4th. And around that time? Yes, sir. Did she have conversations with the attending personnel? Yes. And that actually goes to one of my other points about the medical records not being evidence of what Mrs. Holmes knew or should have known. Because while many things were noted in her medical records, the only evidence in the medical records of a communication between the health care provider and the patient was on October 4th, 2009, the same day that the district court decided the statute of limitations began to accrue. And the notation actually shows that, first of all, she had a lot of difficulty communicating. And her altered mental status is well documented over the several months she was hospitalized. So by using gestures, she asked the neurologist, what is wrong with me? And he told her that she had H1N1, that swine flu. There's no evidence in any of the medical records that she was ever told that she had Stephen Johnson syndrome. Even what you're saying is even assuming that she was cognizant enough to have received a message from her medical provider about her condition or the cause of it or the disease, there's nothing in the medical records that suggests that the actual disease or something that put her on the suspicion of the actual disease or injury was communicated to her. That's correct. And also there's a distinction here about whether she knew she was injured. But it takes more than that for a statute of limitations to begin to accrue. She needs to have been aware that she was wrongfully injured. And for example, if she was told she had H1N1, there's no liability there. She's not been wronged. She's just being told you're injured. She was never told that you have a severe cutaneous adverse reaction to a drug, which that might have put her on suspicion. Now, some of the many specialists who evaluated her might have indicated some of that in her medical records. That doesn't mean it was communicated to her. The only evidence we have of what was communicated to her was that notation. And even the, I'm trying to recall whether I've got my facts straight, this October diagnosis, does it really identify this or say it could be induced by drugs, or is it a possibility? Am I mixing up my evidence? Was this just a possibility that it's induced, or was this probably drug-induced? Well, H1N1... I know that's not. But what's at issue here, what the district what did the physician say about that? Does he say it is drug-induced, it's possibly drug-induced, it may be drug-induced? What was the operative language? When you ask me what did the physician say, do you mean to her or in the medical records? In the medical records. In the medical records. I know there's nothing that says that he told her in the records. Some of the specialists did pose questions about whether what was occurring was either Stevens-Johnson syndrome or toxic epidermal necrolysis. And those are usually drug-related. But you say posed questions. Is that your description of it, that they say it was drug-induced, that they say probably it was drug-induced? It really wasn't until close to the end of her hospital stay, right before she was discharged, that they started narrowing down to the SJS or the 10. What about the allegation, which the district court depended upon, that on September 25, Dr. Wolf, right, gave a possible drug diagnosis. And then he said it was likely drug-based. He told that directly to the plaintiff, right? No, sir. That was in the medical records, yes. But there's no evidence in the medical records that that was told to her. And also around that time, there were a lot of other notations in her medical records of what it could possibly be. I mean, even though it might have been connected to a drug, she was taking a number of other drugs? Yes. But more importantly, on that date, September 25, she was in a coma. She was in a coma from September 19 until she came out October 4. And that's my point, is that just because something was put in her and she might have been made aware of it later when she was discharged from the hospital, but contemporaneously with the notation in the medical records, you know, that's just not how it works. And at the time, I'm trying to figure out, at the time, there was a speculation, there's still speculation in the medical records about what it was, right? They couldn't figure out what was wrong with her. I mean, she was evaluated by infectious disease. She was evaluated by neurologists, pulmonologists, dermatologists. They thought she had a stroke. But when all these experts disagree and don't know what caused it, she's supposed to be on suspicion of what actually did cause it. How can that be? So, actually, I think from your questions, I've covered the three reasons why the accrual date was incorrect. The second being the conflicting information in the medical records. If the physicians didn't know what was wrong with her, how could she be able to discover what was wrong with her? Well, the discovery rule doesn't require firm knowledge. I agree. Why should we conclude that the basis for suspicion that she had wasn't enough to start the clock running? She's got a couple years after that to sort through the facts and figure it out. District Court concluded that there was enough basis, enough suspicion to start the clock running. Why not? Well, when she came out of the coma, she was curious. She asked the first doctor she saw, what's wrong with me? And he told her, you have swine flu. So, you know, he's a specialist. He's answered her question. Why should she keep looking? I mean, in retrospect, yes, from the District Court's position, in retrospect, that might make sense. But to her at the time, this is the information she was presented with, her questions answered. At what point do you think she had enough knowledge to start the clock running? Right before discharge. Now, this woman, she's a lay person. She's not a health care provider or anything. But she's very savvy. And she really did want to know what was wrong with her and what happened to her because she was very sick. She almost died. So right before discharge, they narrowed down the diagnosis to SJS, maybe for Tamiflu, for Dilantin. They didn't know what. But I believe that when she was being discharged and was given this information, which is usually when the patient is being given this information, when they're being discharged, that is when the clock began to run. And that was early December 2009. And this lawsuit was filed in early November 2011. When was she still being told that the record reflects that she was still being told that it was swine flu? That was actually the only notation she was told of anything in the medical records. And when was that, my question? When was that? After her coma is over and before she gets this other information that you're now talking about where she's going to be close to discharge. There's no evidence that she was told anything else until being  And actually in between those dates, she was being treated for septic shock from all of the surgeries and the debridement and the burn injuries all over her body. So it's not like she was comfortable in the recovery ward pondering how this happened to her. She came out of the coma and went to rehab for a couple days and got sent back to the hospital because she was in septic shock. She doesn't have to have information that her problems or condition was caused by a specific drug in order to start the statute running, does she? No, sir. I agree with that. But your position still, she did not know enough until the time of her discharge to start the discovery rule running. She did not know that she had been wronged. You all don't seem to disagree on what the standard is or what the issue is. You disagree on what it is that, I mean, you all don't disagree that at the time she had reasonable suspicion to know that it was drug induced, that that would have started the clock. Absolutely. Not what particular disease, not what particular medicine or whatnot, particular drug, but at the time that she had a suspicion that it was drug induced, you all seem to agree on that. I agree with that. So then the question then just becomes is it established here for the purpose of summary judgment that there's no issue with respect to that and it's just a matter of law time barred, or did the judge make inferences about her knowledge that aren't supported by what you have in the medical records? Well, it's worse than that, actually, because this is a 12B6 motion. That's right. We never even got to that. So all the inferences have to be in your favor. Exactly. But the district court, I think, read your complaint as relying primarily on the fact that, what was the term, that your client had a cloudy mental state, right, that affected her memory as sufficient to toll the statute. But I think the district court said that's not enough to toll the statute. Is that what you relied on in your complaint? No, sir. A cloudy mental state or something like that, right, that kind of allegation? See, the question really comes down to, now, under Iqbal, I mean, how specific does your allegation have to be in order to toll the statute? Well, I mean, the allegations were pretty specific about not just her altered mental state, but the fact that there was nothing to give her suspicion. Isn't your argument really, is the suspicion that the doctors have, and it's reflected in the records, enough to start the tolling against her? Isn't that really what this is about? In other words, do you attribute what the doctors suspect to her? And where do you draw the line between the fact that she doesn't have to have exact knowledge and what you can infer when her suspicion should have arisen? That's really what the issue is here, isn't it? It is, and it is, that you can't accept information that's contained in the medical records as information that is obtained by her or even available to her at that time. It's not like she could look at her medical records. And, in fact, medical records, the purpose of them is to document what's happening, not what's being discussed. It's actually not often that you have notations in a medical record about a discussion. The doctor is just observing. Some of these notations were made when she was in a coma. So how can they be attributed to her knowledge or her being available to the information? I think I'm out of time. Thank you. We'll hear from counsel for defendants. Good morning, Your Honors. My name is Sarah Johnston, and I'm here on behalf of Defendant Annapelle Johnson & Johnson, Janssen Pharmaceuticals, Inc., and Janssen Research and Development, LLC. At the outset, before getting into the substantive discussion of the statute of limitations, I'd first like to correct a little bit of the discussion of Judge Phillips' order on the motion to dismiss. And as a general overview, just to note that after the filing of the first amended complaint, Judge Phillips issued a very specific order instructing plaintiffs on how to amend her complaint to overcome both the UCL issues and also the statute of limitation issues. And in that order, Judge Phillips had initially determined that the statute of limitations for Ms. Holmes had begun to run, I believe, on September 29th of 2009, which is the date where the consulting dermatologist first made a tentative diagnosis of a drug-based reaction. And in that order on the motion to dismiss, Judge Phillips said, if this is not the case, then come back and give me more information about when that statute should begin to toll. And plaintiffs failed to do that in the second amended complaint. The allegations suggest at most that Ms. Holmes was- Tell us what allegations Judge Phillips relied on in concluding that the statute had started to run. It's the allegations at page- well, in the second amended complaint, it's paragraph 63. I don't have the paragraph for the first amended complaint, but it's the reference to the medical record where a dermatologist suspected that- Which paragraph would you say? Which paragraph? 63 of the second amended complaint. 63. All right. Go ahead. And that's the reference to the record where a dermatologist first began to suspect that Ms. Holmes' illness was caused by- Why would one physician's suspicion constitute, as a matter of law, suspicion by the person that you're going to use the limitations against? Certainly, Your Honor. And I think that in order to respond to that question, I have to backtrack just a bit to look at the purpose of the discovery rule as a whole. And that purpose is to look at when a reasonable person would have- a prudent person would have become suspicious of some wrongdoing, and that's what starts the- But if you don't have anything in the record, let's say I'm a reasonable person, just for arguments purposes, and I'm in a coma, and I have doctors out there, and they have all sorts of different opinions with what's wrong for me, and I'm in the hospital for a long time, and they're treating me for sepsis, and they're treating me for this, and they're treating me for swine flu, and one of the doctors is-maybe his specialty is a little bit better, or maybe he's just enlightened, and he suspects that it's drug-induced, and it's during the period when I'm still in a coma. If I'm going to have knowledge of what that doctor suspects, why can't I also rely on all the other doctors that suspect something else and are treating me for something else? Why am I pointed to the only doctor that for the first time suggests that maybe it's drug-induced, and then I'm stuck with limitations, even though the doctors are treating me for something else, and there's nothing to show that while you call him a consulting doctor, that there's nothing to show that he's actually consulted with her or told her that. And if he has, why doesn't she get the benefit of all the other people that had different ideas? And I think in response to that question, I would say that plaintiff's reliance on this idea that the differential diagnosis prevented her from knowing or having reasonable suspicion that she had had this adverse drug reaction, it's merely a distraction, because the very record that plaintiff relies on to say this is when she definitively knew that she had suffered some sort of an adverse drug reaction was that December 2, 2009 discharge summary. That includes nine other diagnoses, including swine flu, including various allergic reactions, allergies to drugs. But you know at least that I'm out of the coma now. I'm not. I mean, I'm in a coma. And the same records that you rely on are saying, you know, I'm in a coma. That's correct, Your Honor. Are you going to charge me for what some doctor thinks while I'm out of my mind? Well, and I think to respond to that, it's important to go back and look at the actual timeline of events and to, again, consider Judge Phillips' ruling at the district court level. Judge Phillips read the complaint and, as pleaded, Ms. Holmes was not in a coma as of October 4, 2009. That's pleaded in the complaint. No, but you see, but the allegation in the complaint you're depending upon relate to, I think, what the plaintiff takes as, you know, the doctor's notes in the medical record. There's no pleading that the doctor told that to the patient, is there? That the doctor told the plaintiff. To the patient. I mean, for instance, that, you know, it was drug-induced or something like that. These are just notes in the record, right? That's correct. So how does that give notice to the plaintiff? Because... Is she supposed to read her medical records? No. Most hospitals won't let you do that, you know, as you know, I'm sure. Right? That's correct, Your Honor. However, I think that it's important to first look at the date where Ms. Holmes... Well, you said, I asked, well, you know, what's in the complaint that discloses the running of the, starting of the discovery period, you pointed to Paragraph 63, and that's nothing but a summary of the physician's notes. There's no allegation that that was told to the plaintiff. That's true, but the plaintiff has, at this point, had two opportunities to amend the complaint. If there was going to be an allegation that... Well, I know, but if she said enough to begin with, she doesn't have to say more, whether she has to amend it or not. She doesn't have to amend the complaint to say when the statute starts running. That's not her obligation. In fact, it's very unusual to decide the statute of limitations issue on a 12B6 motion, isn't it? No, Your Honor. My point was regarding amendments that if she was going to actually plead that no doctor told her this, this would have been in the complaint. She doesn't. Yeah, but you're trying to infer that a doctor did tell her, and we're at a point where the inferences go the other way. You're trying to stick on her your burden. You've got to show that limitations applies, right? No, Your Honor. Or that there's nothing in that her complaint shows that limitations applies. And you're saying because there's nothing there, she didn't fulfill her burden, and so I get the inference that she was told. No, Your Honor. I think that the standard... Well, was she told or not? Well, that's an actual notice standard, and the discovery rule... Well, I understand that, but was she told about the possibility that all you have is this medical notation? So if there had been a medical notation from the very first day she went in the hospital and before she started getting treated for all this stuff, if there had been one doctor that had one medical report that said maybe she's got this, then her statute of limitations claim would have been running right from the very beginning, even though she got treated for sepsis and everything else. No, Your Honor. First off, diagnosis doesn't equal discovery. This is not an actual notice standard. It's rather what would a reasonably prudent person think. And at this point, looking at the facts most favorable to Ms. Holm, which the district court did, which Judge Phillips agreed to toll the statute of limitations until the period where she was no longer in a coma. At that point, when she awoke from a coma, as Ms. Beasley noted, she was told that she had swine flu. She had flu. But at that point, as is alleged in the complaint, she also had a painful, debilitating, and very physically manifested illness. Which the doctors all disagreed to, but a reasonable person is supposed to think the opposite of most of her doctors. No, Your Honor. I think that the standard is that a reasonable person should be suspicious at that point that something had occurred. When you say something, does it have to be something drug-induced or just something? Some wrongdoing had occurred. Well, what has to be wrongdoing? Why can't it be caused by a disease or some condition that's not wrongfully induced? Why does that give rise to an inference of wrongdoing? Just because you have a condition. If you get appendicitis, it doesn't mean there's wrongdoing, does it? No, Your Honor. Well, I mean, so there has to be something more that gives indication of wrongdoing. What's the indication of wrongdoing besides the fact that she has this condition? Well, for instance, the case that's cited in plaintiff's opening brief, it's Nelson v. Endavis Pharmaceuticals, Incorporated, where the plaintiff ingested Fin-Fin and over the course of a period of time experienced a lot of vague symptomology, dizziness, lightheadedness, things like that. And in that case, the court determined that the severity of the symptoms was not enough for her to make any sort of logical link between her ingestion of that drug and the symptoms. In this case, it's very different. When Ms. Holmes was admitted into the hospital, it's in her records and pleaded in the complaint that the only drug that she was taking at that time was Levaquin. And in the light most favorable to plaintiff, she didn't need to have a reasonable suspicion when she manifested these symptoms until October 4th. If Judge Phillips had determined that the facts were taken in the light least favorable to plaintiff, then when she was admitted to the hospital and approximately a day or two later started to develop dermatological symptoms, which is noted in the record and pleaded in the complaint, then at that point she should have had at least reasonable suspicion that something that she ingested had caused or contributed to those symptoms. And importantly, I think, to sort of step back from this issue, I think it's important to note that the discovery rule serves to assist claimants who, through no dilatory practice on their own part, fail to timely file a claim because they have no notice of wrongdoing. It doesn't serve to take the statute of limitations that is set by the legislature for the specific purpose of offering a plaintiff an adequate period of time in which to investigate her claim and then tack on a few days in sort of an arbitrary fashion. And in this case, it's clear from the complaint that at most, as of October 5th, 2009, Ms. Holmes was in perhaps a foggy or hazy mental state due to the painkillers that she was on. But that's not sufficient to toll the statute of limitations. Why is that? That's not a factual question? I'm sorry? I said it's not a factual question as to whether that mental state was sufficient to toll the statute? Not in this case where the allegations are not that it was insufficient for her to be able to manage her affairs, which is the standard in California. So in California, we can toll the statute of limitations for actual comatose states, but not for things like physical discomfort, emotional injuries, PTSD, things like that. Of a specific allegation in the complaint in paragraph 66, on October 4, physicians told Gail Holmes that she suffered from H1N1 and that it affected her brain, citation. Mrs. Holmes communicated through, quote, gestures and phonation, close quote, another citation. There is no allegation in the complaint that prior to that time, anyone has communicated to her a diagnosis connected to taking a prior drug. As we've talked about before, there's a notation in the medical records, but nothing about it being communicated to her. The only communication that's described is the one described there, that she suffered from what we've called swine flu. So why should she have been suspicious at that date, at a time when she was communicating through gestures, not going to engage in a lengthy conversation with anybody, why should she have been suspicious or inquired as to whether it was a drug reaction? Because, Your Honor, as I stated, when she was admitted into the hospital, the only drug in her system was Levaquin. She began to develop dermatological symptoms shortly after that. So the medical information about the possible drug wasn't even necessary. She should have known way back on her own when she started feeling symptoms or having a dermatological condition. She should have known way back then and being on at least suspicion that it was drug-induced, even though the doctors were telling her it was something else. Yes, because the discovery rule doesn't require diagnosis by a doctor or even consulting with a doctor. I understand. And, again, I think that Judge Phillips' ruling after the first motion to dismiss did explain what the uphill battle was going to be in order to meet this statute of limitations claim. The issue with the second amended complaint is that, at most, all plaintiffs managed to do was to toll that statute by a couple of weeks rather than to reach November 8th of 2009. And I think it's also reasonable to look to the entire body of records that are cited throughout the complaint and incorporated by reference into the complaint and therefore part of the plea. When you say a couple of weeks, what is the basis for that? Is that when she comes out of this coma state? Correct. All right. And at that time, there's still nothing that suggests to her people told her that it was drug-induced? There are. And the only specific communication that's shown by the record is that she was told it was flying flu. That's correct, Your Honor. But, again, I would say that the differential diagnosis here is a distraction from, you know, it's essentially the equivalent of saying because you have the measles, you can't have a broken arm, and that's not the case. She's told that she has the flu, which includes flu-like symptoms, but is not supposed to reasonably suspect that this physical manifestation of this major dermatological reaction all over her body should not be reasonable suspicion or reason to suspect. And I realize that I'm past my time. I'm happy to address any questions on the UCL claim or any further questions on the statute. I think we're fine. Thank you very much. Thank you for the opportunity, and I appreciate your time. The case just argued is submitted. Have we used up all the time? Okay. The case just argued is submitted. We thank both counsel for your arguments.
judges: Benavides, Tashima, Clifton